**Frank DiMATTINA, Movant,**

v.

**UNITED STATES of America.**

**Nos. 13–CV–1273, 11–CR–705.**

United States District Court,
E.D. New York.

June 13, 2013.

Loretta E. Lynch, Esq., United States Attorney by Jack Dennehy, Esq., Assistant United States Attorney, Eastern District of New York, for the Government.

Jeffrey H. Lichtman, Esq., Law Offices of Jeffrey Lichtman, Sarita Kedia, Esq., Law Offices of Sarita Kedia, Marc A. Fernich, Esq., Law Offices of Marc Fernich, New York, NY, for the Movant.

## FINDINGS OF FACT AND LAW, MEMORANDUM, ORDER, AND JUDGMENT ON 28 U.S.C. § 2255 MOTION

JACK B. WEINSTEIN, Senior District Judge.

### Table of Contents

I. Introduction ...................................................391

II. Facts and Procedural History ...............................392
 A. Crime of Conviction ...................................392
 B. Rule 33 Motion .......................................396
 C. Sentencing ...........................................399
 D. Direct Appeal ........................................399
 E. Section 2255 Motion: Substance and Practice ..........399
 F. Section 2255 Hearings ................................402

III. Section 2255 Collateral Attack Prior to Resolution of Direct Appeal .............405

IV. Asserted Grounds for Relief ................................409
 A. Ineffective Assistance of Counsel .....................409
 1. Law ..............................................409
 2. Application of Law to Facts Pertaining to Ineffective Assistance of Counsel ...........................................410
 B. Actual Innocence......................................414
 1. Law ..............................................414
 2. Application of Law to Facts Pertaining to Actual Innocence ...........421

V. Certificate of Appealability ................................422

VI. Conclusion ................................................422

## I. Introduction

Prior to resolution of his appeal before the Court of Appeals for the Second Circuit, defendant Frank DiMattina ("DiMattina" or "Defendant") seeks collateral relief from a conviction and sentence imposed on one count of extortion and another for use of a firearm in connection with extortion.

This odd—but sensible, in view of the circumstances—procedural turn, directed by the appellate court, raises interesting procedural questions by requiring the trial court to rule on a then-nonexistent motion pursuant to 28 U.S.C. § 2255 after the direct appeal was taken but before it has been decided. *See* Part III, *infra*.

DiMattina contends in this collateral attack that (1) he received ineffective assistance of trial counsel and (2) he is innocent. An alibi defense—presented first in a post-trial motion pursuant to Rule 33 of

the Federal Rules of Criminal Procedure and now collaterally pursuant to 28 U.S.C. § 2255—lies at the heart of DiMattina's claims.

Trial counsel's failure to pursue this "defense" is the basis for the ineffective assistance claim. The same evidence he adduces in arguing that his trial attorneys missed an obvious alibi defense is offered in support of his actual innocence claim. Neither ground asserted by DiMattina provides a viable avenue to section 2255 relief. *See* Part IV, *infra.*

DiMattina's trial attorneys ably handled the defense. *See* Part IV.A, *infra.* They vigorously pursued a strategy of disproving the credibility of the government's key witness. At no point during, or immediately after, the trial did DiMattina suggest or hint to his lawyers a possible alibi defense. Omniscience by a lawyer cannot be assumed. The client bears some responsibility for providing, at minimum, a scintilla of reason to investigate and pursue an alibi.

Exploration of the law and facts supporting a claim of actual innocence is required. *See* Part IV.B, *infra.* It is assumed—because of the availability of new tools, in some cases, to demonstrate innocence almost to a certainty—that a showing of actual innocence may now provide a substantive as well as procedural ground for collateral relief. *See* Part IV.B.1, *infra.* But the burden of sustaining such a claim—however it may be defined—has not been met. *See* Part IV.B.2, *infra.*

For reasons stated orally and on the following findings of law and facts, the section 2255 motion is denied.

## II. Facts and Procedural History

### A. Crime of Conviction

Following a three day jury trial that began in January 2012, DiMattina was found guilty of one count of extortion in connection with a competitor's bid on a school lunch program and a separate count of using a firearm in connection with the extortion. *See United States v. DiMattina,* 885 F.Supp.2d 572, 576–77 (E.D.N.Y. 2012) (denying Rule 33 motion, setting forth basis for sentence imposed and granting bail pending appeal). He was acquitted on three additional counts related to destroying a window of the restaurant he had sold to the chief witness against him, Walter Bowers. *See* Jury Verdict, *United States v. DiMattina,* No. 11–CR705 (E.D.N.Y. Jan. 6, 2012), ECF No. 62.

Both the complaint, filed in September 2011, and the indictment, filed in October 2011, alleged that the extortion related to the use of a firearm occurred "'[o]n or about and between June 1, 2010 and September 1, 2010, both dates being approximate and inclusive.'" *DiMattina,* 885 F.Supp.2d at 576 (quoting Sealed Compl.). The complaint and indictment make clear that the crime occurred shortly after Bowers, the victim, submitted a bid on a school lunch contract and almost immediately prior to it being withdrawn. *See, e.g.,* Sealed Compl., *United States v. DiMattina,* No. 11–CR–705 (E.D.N.Y. Sept. 15, 2011), ECF No. 1, at ¶¶ 4–6 (describing that Bowers was confronted by DiMattina "soon after he placed the bid for the School Lunch Program Contract" and that "on the next business day after this confrontation with DiMattina, [Bowers], out of fear for his personal safety, withdrew his bid for the School Lunch Program Contract").

Several months before the crime, in March 2010, Bowers and DiMattina were involved in a business deal in which DiMattina sold Bowers a catering hall on Staten Island. *See DiMattina,* 885 F.Supp.2d at 575–77. It was named "Aria-

na's" after DiMattina's eldest daughter. *Id.* DiMattina did not sell, and continued to operate, two separate catering halls—one on Staten Island and another in Woodbridge, New Jersey—under variations of the name "Ariana's." *Id.* at 575. The contract governing the sale of "Ariana's" in Staten Island permitted Bowers to use the name for a limited period of time. *Id.* In a civil suit, DiMattina alleged that Bowers was continuing to use the name "Ariana's" without authority and failed to make payments for the purchase price of the business. *Id.*

On October 25, 2011, Defendant exercised his right to a speedy trial. *See* Ltr., *United States v. DiMattina,* No. 11–CR–705 (E.D.N.Y. Oct. 25, 2011), ECF No. 15. On the same day, he moved for a bill of particulars, requesting that the government state with more specificity when the alleged extortion occurred. *See* Mot. for Bill of Particulars, *United States v. DiMattina,* No. 11–CR–705 (E.D.N.Y. Oct. 25, 2011), ECF No. 13.

The motion for a bill of particulars was denied orally at a hearing on November 30, 2011. *See* Mot. to Vacate, Set Aside, or Correct Sentence, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Mar. 11, 2013), ECF No. 1 ("Section 2255 Mot."), Ex. C (Tr. of Pre–Trial Conf., Nov. 30, 2011), at 3. Bills of particulars under this federal district's generous discovery procedures are redundant: the court expects the United States Attorney to open its files to the defendant unless there is a good, articulable reason not to do so. Defendant has conceded as much. *See* Tr. of Sentencing Hr'g, Mar. 30, 2013 ("Mar. 30 Tr."), *United States v. DiMattina,* No. 11–CR–705 (E.D.N.Y. Oct. 25, 2011), at 26 ("[Defendant's Counsel]: *I know that bills of particulars are routinely denied and they probably should be routinely denied*

except in cases like this." (emphasis added)).

The government has demonstrated that before the trial it revealed everything it knew about the date and time of the alleged incident. *DiMattina,* 885 F.Supp.2d at 576. Material turned over pursuant to 18 U.S.C. § 3500 ("3500 Material") included an FBI report that summarized two interviews with Bowers as well as Bowers's grand jury testimony. The FBI report stated that Bowers told an agent that he was "called" by DiMattina on a "Saturday morning" before engaging in a "walk-and-talk with DiMattina in approximately July or August of 2010" on a "Saturday." *See* Section 2255 Mot., Ex. E ("FBI Report"), at 3. The FBI report and grand jury testimony were consistent in relaying that the "walk-and-talk" was initiated when DiMattina approached Bowers at Ariana's in Staten Island, accompanied him to an area next to the catering hall, and threatened him with a gun when discussing their competing bids on a school lunch contract. *Id.;* Section 2255 Mot., Ex. E ("Grand Jury Tr."), at 20–22. Both sources of information stated that, after showing Bowers the gun, DiMattina turned to an associate and instructed him, so that Bowers could hear, to physically assault Bowers if he did not withdraw his bid. FBI Report 3; Grand Jury Tr. 22.

The transcript of the grand jury testimony reflected that Bowers placed his bid on the school lunch program in "June because the [priest in charge of the program] said 'We have to have this wrapped up by July 4th because school is shutting down, and you need at least two months to get all the paperwork together.'" Grand Jury Tr. 18–19. Bowers testified before the grand jury that he withdrew his bid *after* DiMattina had threatened him with a gun *on a Saturday. See id.* at 21–23. Upon reviewing the FBI report and grand jury

transcript, DiMattina's trial counsel knew the alleged extortion and use of a firearm occurred "between June and July 4." Tr. of Hr'g on Ineffective Assistance Claim, Mar. 21, 2013 ("Ineffective Assistance Hr'g Tr."), at 33. DiMattina did not subsequently renew his motion for a bill of particulars. *Id.* at 34.

Bowers testified to the following facts at trial:

> DiMattina was a competing bidder on a contract for a school lunch program at a local Catholic high school. *On a "Saturday, the last week in June [2010]," *DiMattina approached Bowers at Ariana's. DiMattina asked Bowers to step outside and speak to him. He then led Bowers to an alley behind the catering hall, where they were met by an unidentified accomplice of the defendant. To induce Bowers to withdraw his bid, DiMattina threatened him. Demonstrating the seriousness of this demand, DiMattina lifted his shirt to reveal a gun stuck in his waistband. Bowers identified one of the guns seized from the defendant when he was arrested as the gun he saw. DiMattina then instructed his accomplice, "Take a good look at this kid [Bowers]. You are going to come back here and kick his ass if he doesn't get out of the bid." He also told Bowers to tell Lawrence Chiarappo, Bowers's business partner, that he would burn Chiarappo's bagel stores down if the bid were not withdrawn.

*DiMattina,* 885 F.Supp.2d at 576 (internal citations omitted; emphasis added; clarifying alterations in original). Notably, although the FBI report indicated that "Bowers recalled that DiMattina ... *called* him on a Saturday morning," *see* FBI Report 3 (emphasis added), Bowers was not questioned about whether, and did not testify at trial that, he received a phone call from DiMattina before their encounter.

Bowers stated at the trial that he was "alone" with DiMattina and DiMattina's associate throughout the gun encounter. *See* Tr. of Crim. Trial, *United States v. DiMattina,* No. 11–CR705 (E.D.N.Y. Sept. 27, 2012), ECF Nos. 97–99 ("Trial Tr."), at 109–110. When he returned to Ariana's, he told Chiarappo, who owned several bagel stores in the area: "[DiMattina] just threatened us to get out of the bid. . . . He showed me a gun. . . . And you know what, he actually said he was going to burn down your stores. We got to get out of this bid." *Id.* at 117. The two of them then agreed that Bowers would withdraw his bid on the school lunch contract. *Id.* at 118. Bowers agreed to "call the priest [in charge of the program, Father Michael Reilly,] on Monday and go see him right away." *Id.* Bowers called Father Reilly's secretary that Monday and arranged for a meeting where he withdrew his bid. *Id.*

While Chiarappo did not witness the threat, his trial testimony corroborated that Bowers described the incident to him immediately after it occurred. *Id.* at 245. *See also* Fed.R.Evid. 803(2) ("A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is not excluded by the rule against hearsay even if the witness is available to testify.). Chiarappo testified that DiMattina's message—conveyed through his "associate"— about burning down the bagel stores influenced him to support withdrawing the bid. *See* Trial Tr. 250–51 ("Q: . . . [D]id Mr. Bowers tell you anything that Mr. DiMattina told Bowers to tell you; in other words, tell your partner anything? A: He said, tell the kid that I'm going to burn his bagel stores down. Q: If what? A: If you won't withdraw the bid. Q: Did that have an effect at all on your decision with Mr. Bowers about whether to stay in the bid for the school lunch contract? A:

Yes."). *See also* Fed.R.Evid. 803(1), (3) (exceptions to hearsay rule for present sense impression and then-existing state of mind).

The priest in charge of the school lunch program, Father Michael Reilly, credibly established at trial that Bowers's bid was submitted in the spring of 2010 and withdrawn on June 28, 2010, the first business day after the last Saturday in June 2010. *Id.* at 207–09, 230. He testified that, on June 28th, Bowers left a message with his secretary "about the bid" stating that he "wanted to meet with [the priest]." *Id.* at 236. *See also id.* at 209. He confirmed that Bowers later withdrew his bid in-person that Monday afternoon, explaining to the priest that he had "got a visit." *Id.* at 239. Father Reilly described Bowers as looking "very fearful" during the encounter. *Id.*

Before and during the pendency of the trial, DiMattina was represented by attorneys John Meringolo and Martin Geduldig, as well as by Meringolo's associate, attorney Clara Kalhouse. At the time of DiMattina's criminal trial, Meringolo had conducted approximately eight trials and was an adjunct professor at Pace Law School and New York Law School, teaching classes on trial advocacy. *See* Ineffective Assistance Hr'g Tr. 68. Meringolo's co-counsel, Geduldig, has been an attorney since 1967 and, at the time of the trial, had conducted "in excess of fifty" federal criminal trials. *Id.* at 73. DiMattina's trial attorneys employed a private investigator—a retired New York City Police Department detective—to assist in developing evidence. *Id.* at 53, 75. They also initiated a civil suit on behalf of DiMattina against Bowers in Richmond County Civil Court based on the commercial dispute over the sale of Ariana's, seeking to take Bowers's deposition in the civil suit for use at the criminal trial. *Id.* at 54.

The last day of June 2010 was on a Wednesday; July 4th was the following Sunday. From the reports, grand jury minutes, and prosecution's case, it would have been apparent to defense counsel that the threat occurred on Saturday, June 26, 2010. This was the last Saturday in June, and the bid was withdrawn before July 4th, on Monday, June 28th. The priest in charge of the bidding process, unchallenged as to veracity, testified that he received a phone message from Bowers earlier in the day on June 28th, Bowers's bid being withdrawn in person later that afternoon. *See* Trial Tr. 208–09, 235, 239.

No suggestion of an alibi for the day, time, or place on which the alleged gun threat occurred was made by the Defendant prior to verdict. Nor did DiMattina's trial attorneys move for a continuance—which it was clear to counsel would have been granted—to develop an alibi defense once the date, time, and place of the gun threat was fixed. *See DiMattina,* 885 F.Supp.2d at 576; Ineffective Assistance Hr'g Tr. 71 ("[Meringolo]: . . . . I'm aware that the Court would have given me the continuance.").

Both Meringolo and Geduldig testified during the section 2255 hearings that DiMattina did not inform them during the trial, or even reasonably soon after the verdict was rendered, of a potential alibi. *See* Ineffective Assistance Hr'g Tr. 57–58, 61 (Meringolo); 74–75 (Geduldig). Not until several weeks after DiMattina was found guilty did he begin to pursue—through subsequently retained counsel—an alibi defense. *Id.* at 91–93 (alibi defense developed with subsequently retained counsel beginning about "forty days after verdict").

During the trial, DiMattina and his attorneys executed a sensible strategy of "show[ing]" that Mr. Bowers had fabricated the event entirely" to exact leverage over

DiMattina in their business dispute. *Id.* at 79. Bowers's credibility was repeatedly, and strongly, attacked. When asked to identify the weapon used during the extortion, Bowers incorrectly testified at trial that he was shown a lineup of six guns when in fact he was only shown four. Trial Tr. 57 (testimony of officer that conducted gun lineup); 112 (Bowers testimony).

Inconsistent statements relating to key underlying facts were used to impugn Bowers's overall credibility. *See, e.g., id.* at 356 (Meringolo summation to jury: "When Mr. Bowers was asked on direct examination how many guns did you review two days ago, you know what he says . . . he says six guns. Well, ladies and gentlemen, it was only—actually it was only a day ago and it went from four to six. . . . [C]arefully evaluate the contradictions."). His trial attorneys were attempting to discredit all of the charges—including those supported by a video recording on which DiMattina was ultimately acquitted—that were based on Bowers's testimony. *See* Ineffective Assistance Hr'g Tr. 79 (Geduldig: "Mr. Bowers picked out the wrong gun. It was my take that we could show that Mr. Bowers had fabricated the event entirely. There may have been a meeting, but it did not go down as Mr. Bowers described it.").

At closing, Meringolo told the jury: "the government got it wrong [when] they told you . . . that Walter Bowers . . . was telling the truth. I submit to you he committed perjury, he committed perjury many times, not once but many times." Trial Tr. 350; *see also id.* at 352 ("I respectfully submit that there's motivations here, there's motivations for Mr. Bowers and this incident, this gun incident . . . ."); *id.* at 354 ("I submit to you he's a liar and if you think he lies about a material fact, under the law you could disregard his whole testimony."); *id.* at 356 ("You can-

not trust Mr. Bowers"); *id.* at 358 ("And they can't prove this case beyond a reasonable doubt because you can't believe Walter Bowers and that's the law."). The tactical and strategic theory of defense counsel was reasonable and well-executed.

## B. Rule 33 Motion

On March 16, 2012, more than two months after a guilty verdict was rendered against him, Defendant moved for a new trial pursuant to Rule 33(b)(1) of the Federal Rules of Criminal Procedure. *See* Mot. for New Trial Pursuant to Rule 33(b)(1), *United States v. DiMattina*, No. 11–CR–705 (E.D.N.Y. Mar. 16, 2012), ECF No. 70 ("Rule 33 Mot."). He argued that newly discovered evidence established that, at the time he was found to have threatened Bowers with a gun at Ariana's in Staten Island, he was at another catering hall he owned, Ariana's Grand, located in Woodbridge, New Jersey, which is a drive of approximately fourteen miles from Ariana's in Staten Island. *See* Mem. L. Supp. Rule 33 Mot., *United States v. DiMattina*, No. 11–CR–705 (E.D.N.Y. Mar. 16, 2012), ECF No. 70, at 1; Ineffective Assistance Hr'g Tr. 39. He did not initially allege ineffective assistance of trial counsel in his Rule 33 motion. *Id.*

 Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R. Crim.P. 33(a). While a Rule 33 motion must generally be filed within fourteen days of verdict, it may be filed within three years of verdict if "grounded on newly discovered evidence." Fed.R. Crim.P. 33(b). A successful Rule 33 motion based on "newly discovered evidence" must demonstrate that "facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence" before or during trial. *United States v.*

*Owen,* 500 F.3d 83, 88 (2d Cir.2007). "Due diligence has not been exercised if the defendant or his counsel could have, without unusual effort, acquired the evidence before or during the trial." *DiMattina,* 885 F.Supp.2d at 577 (citing *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)).

■ A movant's ultimate burden on a Rule 33 motion is to demonstrate that newly discovered "evidence would likely result in an acquittal." *Owen,* 500 F.3d at 88. Rule 33 relief should be granted only if there is "a real concern that an innocent person may have been convicted." *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992). And only when such "exceptional circumstances can be demonstrated," may a "trial judge ... intrude upon the jury function of credibility assessment." *Id.*

Although DiMattina chose, as was his right, not to testify at his criminal trial, at the Rule 33 hearing he submitted an affidavit. *See* Rule 33 Mot., Ex. A ("DiMattina Rule 33 Aff."). He claimed to have been—and continues to claim—that he "was never in Staten Island [the day of the alleged extortion], except to leave my Staten Island home early in the morning and to return to my Staten Island home very early the following morning (June 27, 2010)." *Id.* at ¶ 5. Affirmed by DiMattina was that, "[p]rior to trial, I informed my then-attorney that I could not be at the place where Mr. Bower's [sic] said I was when he said I threatened him." *Id.* at ¶ 20. He stated that he had "asked my attorney *many* times for the specific date when I was accused of extorting Mr. Bowers." *Id.* (emphasis in original). According to DiMattina, it was not until "Mr. Bowers testified at trial that the date of the alleged incident was 'the last Saturday in June, 2010' (i.e., June 26, 2010)—[that] I knew I could not have been at the place

where Mr. Bowers said I was and/or committed this crime." *Id.* at ¶ 22.

In an attempt to corroborate his assertions, DiMattina submitted several additional statements from claimed-to-be alibi witnesses to demonstrate that he was seen several times on June 26, 2010 in New Jersey—namely, at Ariana's Grand—and not seen at Ariana's in Staten Island. *See, e.g.,* Rule 33 Mot., Attorney Aff., Mar. 16, 2012, ECF No. 7, at ¶ 11 ("I have spoken with Mr. DiMattina, as well as to others, including vendors, guests and employees regarding Mr. DiMattina's whereabouts on June 26, 2010. I have also reviewed various contracts and receipts that were recorded on that date. All show that Mr. DiMattina was at Ariana's Grand Catering in Woodbridge, New Jersey from approximately 9AM that day until approximately 1AM the following day."). Defendant was provided, but did not avail himself of, the opportunity to submit an affidavit or testimony from his trial attorneys as to their knowledge of a possible alibi defense. *See* Mar. 30 Tr. 6–7 ("The Court: [T]he defendant was given an opportunity to call [his] trial attorney. You have no affidavit from him. [Defense Counsel]: From the trial counsel? The Court: Yes. [Defense Counsel]: No, I do not. The Court: .... [T]he court was at all times happy to hear [from trial counsel] including today.").

The Rule 33 motion was deemed untimely, obviating the need to determine whether "[t]he affidavits and other evidence ... submitted by the defendant ... might have established to a jury's satisfaction that the defendant was not at Ariana's in Staten Island on June 26, 2010." *DiMattina,* 885 F.Supp.2d at 578. Defendant had failed to demonstrate that his newly discovered alibi evidence was actually "new"—i.e., that diligence was exercised and the evidence could only have been discovered after the trial concluded. It

was held that "DiMattina's defense attorney could have consulted with his client regarding his whereabouts on that day and if there were any potential alibi witnesses." *DiMattina*, 885 F.Supp.2d at 579. All of the affiants whose testimony was offered to support DiMattina's Rule 33 motion were known to him at the time of trial. *Id.* Most of them were his "employees or business associates" and *no showing was* made that "any were unavailable to testify at trial." *Id.* The motion was untimely because "[t]he defendant was fully aware, while the trial was still ongoing, that an alibi defense was available." *Id.*

Defendant requested orally, through his counsel, during the hearing on his Rule 33 motion that, should it be denied, it be converted into a section 2255 motion for ineffective assistance of counsel. *See* Tr. of Sentencing Hr'g, Mar. 26, 2012 ("Mar. 26 Tr."), at 10–11. This placed Defendant in the unenviable position of arguing both that (a) his trial attorneys were *sufficiently diligent* so that their inability to find "newly" discovered evidence was *excusable,* and (b) they were *insufficiently diligent* so that their failure to pursue an effective alibi defense was *inexcusable.* *See* Mar. 30 Tr. 25–26 ("[Defense Counsel]: Either he was diligent in defending the case and not being able to present the alibi defense in a timely manner during the trial ... or ... the defense attorney was not diligent, should have asked for an adjournment, should have made an attempt to present, to identify the alibi defense and to present it in court. . . .").

· At the Rule 33 hearing, Defendant's then-counsel was directed, but was unable, to provide any authority "that indicates that [the court] can grant a writ of habeas [corpus] on [the] set of facts [before it] before entering sentence." Mar. 26 Tr. 11. A related argument that there was a substantial likelihood that an ineffective assis-

tance claim would be granted on direct appeal was rejected because there was no "fully developed record" on the issue for the appellate court to consider. Mar. 30 Tr. 24–25. There was only a self-serving affidavit from DiMattina attesting that he had informed his trial counsel of an alibi. *See* DiMattina Rule 33 Aff. ¶ 20. No testimony from his trial counsel had been elicited to substantiate what DiMattina claimed to have discussed with his attorneys regarding the critical issue of an alibi defense or whether one was considered, developed, pursued, or not pursued. Mar. 30 Tr. 24–25.

While recognizing that "trial counsel's failure to present this [alibi] defense may raise Sixth Amendment concerns," the court declined, in the circumstances of the case, to rely on Rule 33 in entertaining an ineffective assistance claim, which would be available under section 2255 were there an affirmance. *DiMattina*, 885 F.Supp.2d at 579 (citing *United States v. Dukes*, 727 F.2d 34, 39 (2d Cir.1984)). It would have been unduly burdensome to the trial court, litigants, and prospective witnesses to permit amendment of DiMattina's Rule 33 motion so that his ineffective assistance claim could be adjudicated before a sentence was imposed. Moreover, it would have delayed sentencing inappropriately were post-trial hearings then conducted. *See* Fed.R. Crim.P. 32(b)(1) ("The court must impose sentence without unnecessary delay.").

 An ineffective assistance claim cannot be adjudicated through Rule 33 solely on the ground that it is based on newly discovered evidence. "[I]neffective assistance claims do not present new evidence within the meaning of Rule 33." *United States v. Castillo*, 14 F.3d 802, 805 (2d Cir.1994) (citing *Dukes*, 727 F.2d at 39). DiMattina's ineffective assistance claim would only have been timely on a

Rule 33 motion upon a showing that his failure to bring it within fourteen days after verdict was a product of excusable neglect. *See United States v. Brown,* 623 F.3d 104, 113 n. 5 (2d Cir.2010) (stating that Rule 33 can be a vehicle for ineffective assistance claims outside fourteen day period of Rule 33 if excusable neglect is demonstrated). No such showing was made. *See* Mar. 26 Tr. 10.

Based on the then-record, DiMattina's Rule 33 motion was properly denied.

## C. Sentencing

On March 30, 2012, DiMattina was sentenced to a term of imprisonment of six years and one day, three years of supervised release, a $10,000 fine, and a $200 special assessment. *See DiMattina,* 885 F.Supp.2d at 579–82. The heavy sentence was due to the minimum five year sentence under the gun charge. *See id.* at 582 (citing 18 U.S.C. 924(c)(1)(A)(i)).

Bail pending appeal was granted. *Id.* at 582–90. In reaching the decision to grant bail, it was noted that "the defendant has raised substantial questions that may merit relief on appeal or collateral attack" and that "[i]t would be unfortunate to incarcerate the defendant for a year or more while his appeal pends if reversal follows or, alternatively, if there is an affirmance followed by a successful habeas petition." *Id.* at 589.

At sentencing, DiMattina raised three issues he planned to pursue on appeal: (1) the district court's denial of his bill of particulars; (2) the district court's denial of his Rule 33 motion based on newly discovered alibi evidence; and (3) ineffective assistance of trial counsel. *See* Mar. 30 Tr. 23–27.

## D. Direct Appeal

An appeal was taken on April 3, 2012. *See* Notice of Appeal, *United States v.* *DiMattina,* No. 11–CR–705 (E.D.N.Y. Apr. 3, 2012), ECF No. 84. Defendant did not attempt to argue any of his three areas of concern on the merits. Instead, he moved in the appellate court, on August 30, 2012, for a summary remand to provide the district court with an opportunity to entertain a motion pursuant to section 2255 during the pendency of the direct appeal. *See* Mot. to Remand Appeal, *United States v. DiMattina,* No. 12–1361 (2d Cir. Aug. 30, 2012), Dkt. Entry No. 42. It was represented to the appellate court that DiMattina's unfiled section 2255 motion would be "predicated on the ineffective assistance of trial counsel to investigate and set forth an alibi defense and [would] contain[ ] the written statements of fifteen witnesses that, taken together, demonstrate his actual innocence." *Id.* at ¶ 2. His motion for summary remand alleged that DiMattina's trial attorneys "made no attempt to prepare an alibi defense—or even request a continuance to investigate its viability" and that DiMattina had informed them "that he could not have been present at Ariana's" in Staten Island on June 26th, the day of the extortion with a gun. *Id.* at ¶ 6.

On January 15, 2013, the Court of Appeals for the Second Circuit stayed Defendant's direct appeal "pending the filing and deciding of a section 2255 motion in the district court." *See* Order, *United States v. DiMattina,* No. 12–1361 (2d Cir. Jan. 15, 2013), Dkt. Entry No. 56. In reaching its decision, the appellate court "express[ed] no opinion as to the ultimate merit of DiMattina's *proposed* § 2255 motion." *Id.* (emphasis added).

## E. Section 2255 Motion: Substance and Practice

After remand, and some delay, DiMattina filed a motion to set aside the judgment

of conviction pursuant to 28 U.S.C. § 2255. *See* Section 2255 Mot. (filed Mar. 11, 2013). His motion served, in effect, to proceed separate and apart from the criminal action in which a pending appeal has been stayed.

Section 2255 of Title 28 of the United States Code permits a federal defendant to file a motion to "vacate, set aside, or correct the sentence" imposed on the ground that:

> the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a).

A section 2255 motion is traceable to the ancient writ of habeas corpus. Prior to the adoption of section 2255,

> the district courts for the districts in which federal prisoners were confined entertained habeas corpus petitions; since 1948 [when section 2255 was adopted], collateral review has been available pursuant to [section] 2255 only in the districts in which the convictions were obtained. Thus, [section] 2255 created a new postconviction remedy in the sentencing court and provided that a habeas corpus petition may not be entertained elsewhere.

*Swain v. Pressley,* 430 U.S. 372, 378–79, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977) (citing *United States v. Hayman,* 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952)). *See also* Richard H. Fallon, Jr., et al., Hart and Wechsler's The Federal Courts and The Federal System 1303 (6th ed. 2009) (noting that the pre–1948 system "caused serious administrative problems" by requiring federal prisoners to litigate habeas claims in district courts where the records of the sentencing court were not easily attainable

and it proved difficult to obtain evidence from key witnesses).

The new statute's main concern was with "the mechanics of processing federal prisoners' petitions and was not intended to alter the substance or scope of the traditional habeas corpus remedy." 2 James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 41.2a (3d ed. 1998) (citing *Hayman,* 342 U.S. at 219, 72 S.Ct. 263). Its purpose was, and remains, "to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis v. United States,* 417 U.S. 333, 343, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). *Accord Boumediene v. Bush,* 553 U.S. 723, 774–75, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (section 2255 "replaced traditional habeas corpus for federal prisoners (at least in the first instance) with a process that allowed the prisoner to file a motion with the sentencing court on the ground that his sentence was, *inter alia,* imposed in violation of the Constitution or laws of the United States" (citation and internal quotation marks omitted)); *Kaufman v. United States,* 394 U.S. 217, 222, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969) (section 2255 provides "a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined" (citation and internal quotation marks omitted)).

■ Although a motion brought pursuant to section 2255 is to be made during federal criminal proceedings, the acorn of the section 2255 motion does not fall far from the primordial oak of the writ of habeas corpus now covered in large part by 28 U.S.C. § 2254, controlling habeas corpus proceedings involving state criminal convictions. *See Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 815–16 (2d Cir. 2000) ("Sections 2254 and 2255 are gener-

ally seen as *in pari material.*"). "Unlike the criminal trial where the guilt of the defendant is in issue and his presence is required by the Sixth Amendment, a proceeding under Section 2255 is an *independent and collateral inquiry* into the validity of the conviction." *Hayman,* 342 U.S. at 222, 72 S.Ct. 263 (1952) (emphasis added).

Underscoring the inherently "civil" nature of a section 2255 hearing—akin to a section 2254 proceeding, which is unquestionably civil, *see Keeney v. Tamayo-Reyes,* 504 U.S. 1, 14, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (O'Connor, J., dissenting) (habeas corpus is "an original civil action in a federal court"); *Cross v. Burke,* 146 U.S. 82, 88, 13 S.Ct. 22, 36 L.Ed. 896 (1892) ("It is well settled that a proceeding in habeas corpus is a civil, and not a criminal, proceeding.")—is the fact that it is codified in Title 28, generally pertaining to jurisdictional and civil issues, rather than Title 18, generally pertaining to substantive criminal law and criminal procedure. While the Advisory Committee Notes to the federal rules applicable to a section 2255 motion explicitly note that "a motion under § 2255 is a further step in a movant's criminal case and not a separate civil action," Rules Governing § 2255, Rule 1, Advisory Committee Notes (1976 Adoption), the rules themselves are largely identical to those applicable to a section 2254 habeas corpus petition attacking a state conviction. *See* Hart and Wechsler, *supra,* at 1304 ("[Section] 2255 motions are processed in much the same way as § 2254 petitions, and the Rules Governing § 2255 Proceedings in the United States District Courts are virtually identical to the parallel Rules Governing § 2254 Proceedings."); Liebman & Hertz, *supra,* at § 41.2a ("[G]iven both the Advisory Committee's apparent recognition that the 'further step' taken by the filing of a section 2255 is akin to an appellate step, and the role of federal habeas corpus as a surrogate for appellate review as of right in the Supreme Court, the criminal/civil distinction between section 2255 and habeas corpus proceedings is less consequential than otherwise might be the case." (citing cases)). *See also Wall v. Kholi,* —— U.S. ——, 131 S.Ct. 1278, 1289 n. 7, 179 L.Ed.2d 252 (2011) ("[T]here has been some confusion over whether § 2255 proceedings are civil or criminal in nature.... We express no opinion on this question." (internal citations omitted)); 3 C. Wright & S. Welling, Fed. Prac. and Proc. § 622 (4th ed.) ("[T]he § 2255 action has been regarded as an independent suit. Whether this independent suit is civil or criminal is uncertain.").

The anomalous procedural nature of a section 2255 motion—technically part of a criminal case but civil in nearly all of its aspects—is reflected in the practice by the clerk of this court (and presumably the clerks of other federal district courts) to assign a civil docket number to any such motion, separating it from the docket sheet of its underlying criminal case. *Cf.* Liebman & Hertz, *supra,* at § 41.4b n. 22 (noting that "[t]he frequency with which section 2255 cases are reported with the prior criminal caption reversed—i.e., with a caption styled *'[Movant] v. United States'*—suggests the relative lack of importance that the courts attach to" the Advisory Committee Notes' statement that a section 2255 motion is part of the underlying criminal case). Given the flood of docket entries which often issue during a section 2255 motion, such a docketing practice is sensible. It is an attempt to avoid the confusion created by intermingling the criminal and the section 2255 aspects of the case.

The instant motion thus triggered initiation of what was, practically speaking, a civil hearing requiring evidence beyond the confines of the record developed at trial.

### F. Section 2255 Hearings

While initially based solely on a claim of ineffective assistance by trial counsel for failure to execute an alibi defense, Defendant's motion was later amended to include a freestanding claim of actual innocence. *See* Mem. L. Supp. Frank Di-Mattina's Mot. for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Mar. 11, 2013), ECF No. 1–2 ("DiMattina Ineffective Assistance Mem."), at 1; Ineffective Assistance Hr'g Tr. 4–6.

Extensive briefing and fact-finding ensued on the section 2255 motion. An initial evidentiary hearing on the ineffective assistance claim was held on March 21, 2013. *See* Min. Order, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Mar. 21, 2013), ECF No. 14. Supplemental briefing and additional evidentiary hearings were subsequently permitted on a freestanding actual innocence claim to assist the court in (1) determining the legal viability of such a claim and, (2) assuming one is cognizable, whether it could be proven by Defendant. *See generally* Scheduling Order for Actual Innocence Claim, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Mar. 22, 2013), ECF No. 11.

Upon Defendant's requests, four extensions were granted to permit additional time for his new lawyers to investigate and to brief his claim that an alibi proves his innocence. *See* Revised Scheduling Order for Actual Innocence Claim, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Apr. 9, 2013), ECF No. 15; Second Revised Scheduling Order for Actual Innocence Claim, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Apr. 17, 2013), ECF No. 20; Third Revised Scheduling Order for Actual Innocence Claim, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. May 3, 2013), ECF No. 25.;

Final Scheduling Order for Actual Innocence Claim, *DiMattina v. United States,* No. 11–CV–1273 (E.D.N.Y. May 29, 2013), ECF No. 32. Ultimately, in addition to the initial evidentiary hearing on Defendant's ineffective assistance of counsel claim, evidentiary hearings on the actual innocence claim were held over two days— May 28 and 31, 2013. *See generally* Tr. of Hr'g on Actual Innocence Claim, May 28 and 31, 2013 ("Actual Innocence 2255 Hr'g Tr.").

Because the factual predicates for each of Defendant's grounds for relief are so intertwined, all post-trial evidence was deemed applicable both to the effectiveness of his counsel and to his ability to prove innocence. Relied upon by Defendant to establish an alibi was a mix of the same affidavits submitted in support of the Rule 33 motion, three additional affidavits that averred that DiMattina was not seen at Ariana's in Staten Island but seen in Woodbridge, New Jersey on the day of the incident, live testimony from five of the original Rule 33 affiants, and Bowers's phone records from the day of the incident. *See, e.g.,* Actual Innocence Hr'g Tr.; Ineffective Assistance Hr'g Tr.; DiMattina Ineffective Assistance Mem. at 1; Def.'s Witness List, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Mar. 14, 2013), ECF 3; Def.'s Ex. List, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. Mar. 14, 2013), ECF 14; Supp. Br. in Support of Frank DiMattina's Mot. Pursuant to 28 U.S.C. § 2255, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. May 14, 2013), ECF 27 ("DiMattina Innocence Br."). Bowers was called by Defendant; he testified on the limited point of whether—and, if so, when—he was carrying a cell phone the day of the incident. *See* Actual Innocence Hr'g Tr. 110–34.

DiMattina himself submitted an affidavit at the section 2255 hearing to supple-

ment the one he relied upon at the Rule 33 hearing, but he did not testify or subject himself to cross-examination. *See* Affidavit, *DiMattina v. United States,* No. 13–CV–1273 (Mar. 11, 2013), ECF No. 1 ("DiMattina Rule 33 Affidavit"), at ¶ 4; Ineffective Assistance Hr'g Tr.; Actual Innocence Hr'g Tr. Unlike the affidavit submitted in support of his Rule 33 motion, DiMattina's section 2255 affidavit does not state that he raised the possibility of an alibi defense with his trial lawyers. *See* Affidavit, *DiMattina v. United States,* No. 13–CV–1273 (Mar. 11, 2013), ECF No. 1 ("DiMattina section 2255 Aff.").

DiMattina's lead trial lawyers—Meringolo and Geduldig—were ordered to appear at the evidentiary hearing on the motion and did so. *See* Notice of Scheduling Order for 28 U.S.C. § 2255 Briefing and Hearing, *DiMattina v. United States,* No. 13–CV–1273 (Mar. 11, 2013) (unnumbered docket entry). They testified as fact witnesses and were examined by Defendant's motion counsel, the government and the court. *See* Ineffective Assistance Hr'g Tr. 8–90. They both credibly testified that Defendant never suggested to them the possibility of an alibi defense or gave them any reason to believe one existed. *Id.* at 57–58, 61, 74–75. It was explained by attorney Geduldig that the trial strategy—which resulted in acquittal on three of the five charges brought against DiMattina—was to impugn Bowers's credibility to the point that they could achieve acquittal on all counts:

> Q: Was it the defense in this case that Mr. Bowers and Mr. DiMattina had a business relationship with each other, had a civil dispute you claimed Mr. Bowers was trying to turn into a criminal case for his own benefit?
>
> A: Yes.

> Q: That they knew each other that whole year and were fighting with each other constantly over the sale of this catering hall?
>
> A: That's right.
>
> Q: Is that part of the reason why you said you did not believe that [an] alibi defense would lie, because they were always talking and fighting with each other about something or other?
>
> A: That was part of the reason, yes.
>
> Q: It was your strategy to focus, then, on whether the gun was in fact shown and whether an extortion was in fact committed?
>
> A: Yes.

*Id.* at 86–87. *See also id.* at 79–80, 83–84.

One of DiMattina's attorneys on the Rule 33 motion, Lawrence Schoenbach, testified as to the development of DiMattina's post-trial alibi defense. *Id.* at 91–124. He offered no testimony regarding what Defendant told—or did not tell—Meringolo and Geduldig regarding an alibi. As to the alibi itself, Schoenbach stated that the idea of an alibi defense "was more [my suggestion] than Frank's [the defendant], but certainly he was in the equation." *Id.* at 93; *see also id.* at 92–93 ("The Government: Did he express to you, at any time during the beginning of your relationship, that, 'I couldn't have done this crime' . . . because he had [an alibi]? [Mr. Schoenbach]: When Mr. DiMattina hired me, *I looked through the records. I saw the lack of a date. . . . I looked at the complaint, I looked at the indictment, I looked at the Rule 16 material and the 3500 material, and there was no way to fix a date. . . . So, the three month window, I had been concerned and had discussed with Mr. DiMattina about having it narrowed, or how it should have been narrowed prior to trial.*" (emphasis added; paraphrasing eliminated)).

Live testimony from five of the original Rule 33 affiants was presented to establish the validity of an alibi defense. Three of the witnesses—Geraldine Habeeb, Maryanne Honadel, and Victoria Wall—had hosted parties at Ariana's in Staten Island on the afternoon of June 26, 2010, the day on which the jury found DiMattina to have extorted Bowers. *See* Actual Innocence Hr'g Tr. 67–68 (Habeeb); 77–78 (Wall); 82–83 (Honadel). They each testified that they did not see DiMattina on that day either in the catering hall or its parking lot. *See id.* at 69 (Habeeb); 79 (Wall); 84 (Honadel).

Eric Frigiano was called to establish that DiMattina was frequently seen in New Jersey on June 26th. Frigiano had worked as a maître d' at Ariana's Grand, DiMattina's catering hall in Woodbridge, New Jersey. He testified that he saw DiMattina there "[t]hroughout the day sporadically," beginning around 10:00 a.m. or 11:00 a.m. *Id.* at 90. While Frigiano claimed that he "would have definitely noticed if [DiMattina] was gone for a longer period of time," *id.* at 97, he admitted the focus of his attention was on the approximately 250 guests hosted that day at the New Jersey catering hall. *Id.* He could not account for DiMattina's whereabouts on a minute-by-minute basis. *Id.* at 93–97. It is undisputed that Ariana's Grand is approximately fourteen miles from Ariana's in Staten Island, *see* Ineffective Assistance Hr'g Tr. 39, and, depending on traffic, a twenty-six to forty-five minute drive. *Id.* (twenty-six minute drive without traffic according to Google maps application); Actual Innocence Hr'g Tr. 93 (thirty to forty-five minute drive "depending on traffic" according to Frigiano).

Another of DiMattina's former employees who testified, John Gorgoglione, had worked at Ariana's in Staten Island when DiMattina owned the business and continued working there as a car valet after Bowers assumed ownership. On June 26th, he was stationed near the parking lot of Ariana's in Staten Island. *Id.* at 52–53. His shift began around noon. *Id.* at 52. He testified not to have seen DiMattina or Bowers in the parking lot area on the day of the incident, *id.* at 57, but admitted that he would not have been able to pay attention to the full parking lot area while parking cars or when taking bathroom and meal breaks inside of the building. *Id.* at 61–64. Additional testimony by Gorgoglione—who began working for DiMattina at the age of 15 and has a close relationship with him, *see id.* at 55—that he parked only approximately 15–20 cars was contradicted by Honadel and Habeeb, who testified their parties collectively had approximately 150 guests, most of whom would have driven to Ariana's and used the facility's valet services. *Compare id.* at 61 (Gorgoglione), *with id.* at 75–76 (Habeeb); 85 (Honadel).

Robert Picciano, a retired member of the New York City Police Department, was called by DiMattina to explain that Bowers's cell phone records demonstrate that Bowers was not at Ariana's in Staten Island at the time of the alleged extortion—implying the event did not occur—and to impugn Bowers's credibility by demonstrating that he never received a "call" from DiMattina before the extortion occurred. *See generally* DiMattina Innocence Br. 8–9; Reply Br. in Support of Frank DiMattina's Mot. Pursuant to 28 U.S.C. § 2255, *DiMattina v. United States,* No. 13–CV–1273 (E.D.N.Y. May 23, 2013), ECF No. 31, at 2. Based on Picciano's analysis, DiMattina argued that Bowers's cell phone records demonstrated, contrary to the pre-trial FBI report, that no "call" was placed from DiMattina to Bowers on the day of the extortion. DiMattina Innocence Br. 8–9.

It was suggested by DiMattina, through Picciano's testimony, that "geolocation data" gleaned from Bowers's cell phone records established "that Bowers was not even at Ariana's in Staten Island at the time he claimed the incident occurred." Actual Innocence Hr'g Tr. 6. He testified that the phone records made it "highly unlikely" that Bowers was at Ariana's in Staten Island in the morning or afternoon of June 26, 2010. *Id.* at 19. Of the six closest cell-phone towers to Ariana's in Staten Island, the majority of Bowers's calls on June 26th were processed through the sixth closest tower—which was slightly more than a mile away from the Staten Island catering hall. *Id.* at 16–20. According to Picciano, calls originating from a cell phone at Ariana's in Staten Island would generally have been processed through the five closest cellphone towers rather than the sixth closest. *Id.* at 20. He conceded, however, that a host of variables, such as temporary overloads and the positioning of cell-tower antennas, which he did not analyze, could have affected the cell-tower through which calls were routed. *Id.* at 28–31.

All of the numerous cell phone calls Bowers made that day appear, according to the geolocation expert, to have been made within approximately 1.3 miles from the place the gun threat was allegedly made at Ariana's in Staten Island. *Id.* at 32. The telephone records, far from Defendant's contention that Bowers was not at Ariana's in Staten Island at the time the gun threat was made, are not inconsistent with Bowers's testimony about the event in question. It is undisputed, for example, that between 9:16 a.m. and 12:31 p.m. on the day in question, there are several gaps in usage, including lapses of at least 11, 15, 25, and 45 minutes where no calls were placed or received, and no conclusion can be drawn as to where the phone (let alone Bowers himself) was located. *See* DiMattina Innocence Br., Ex. A, ECF No. 27–1 (Phone Records), at 3. The claimed critical calls were all made and received from Bowers's cell phone when it was, at most, only a few minutes away from Ariana's in Staten Island by car.

Unfounded is DiMattina's reasoning that inconsistencies between the phone records and Bowers's trial testimony, combined with alibi witness information, demonstrate his trial counsels' ineffectiveness in failing to explore an obvious path to victory, an ironclad alibi proving his innocence.

## III. Section 2255 Collateral Attack Prior to Resolution of Direct Appeal

Resolving the collateral attack on a conviction prior to resolution of a direct appeal presents a series of interesting questions implicating procedure, evidence, fairness, and other issues. The Court of Appeals for the Second Circuit's remand was designed to expedite decision on such pivotal issues as whether Defendant received effective trial counsel and whether he could demonstrate innocence.

Development—prior to a decision on the direct appeal—of a fuller record pertaining to trial counsel's strategic decisions, which are critical to an ineffective assistance claim under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), may obviate the need for the direct appeal. It may also provide the appellate court with additional reasons for deciding whether a ground for a successful appeal exists. Two simultaneous bites at the apple—one on an appeal of the denial of a section 2255 motion and another on a direct appeal—by an appellate court permit it to examine a case in all its aspects when a collateral attack is ruled on prior to a decision on the direct appeal.

The Court of Appeals for the Second Circuit has held "that when a claim of

ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court *may*, and at times should, consider the claim at that point in the proceeding." *Brown*, 623 F.3d at 113 (emphasis added). *Cf. United States v. Fleurimont*, 401 Fed. Appx. 580, 582 (2d Cir.2010) ("It is clear ... that *Brown* does not require as a categorical matter that district courts grant a full-blown testimonial hearing in response to all such claims."); *United States v. Outen*, 286 F.3d 622, 632 (2d Cir.2002) ("[T]here is no *jurisdictional* bar to a district court's adjudication of a § 2255 motion during the pendency of a direct appeal." (emphasis in original)); Rules Governing § 2255 Proceedings for the United States District Courts, Rule 5, Advisory Committee Notes (1976 adoption) ("There is no requirement that the movant exhaust his remedies prior to seeking relief under § 2255.").

There is a preference within the Second Circuit for the claims Defendant makes to be resolved through motions made pursuant to Rule 33 of the Federal Rules of Criminal Procedure if they can be brought within fourteen days of the verdict or if there is a valid excuse for failing to do so. *Brown*, 623 F.3d at 113 n. 5. As noted, *see* Part II.B, *supra*, an otherwise untimely ineffective assistance claim under Rule 33, however, cannot be excused on the theory that relevant facts giving rise to the claim were "newly discovered" under Rule 33(b)(1). *See Dukes*, 727 F.2d at 39 (longer timeframe not available for Rule 33 motion for new trial based on newly discovered evidence relating to ineffective assistance of counsel). *Accord United States v. Cammacho*, 462 Fed.Appx. 81, 83 (2d Cir.2012) (" 'The longer period provided by [Rule 33] for a motion based on newly discovered evidence applies only to motions that address the issues raised by the criminal charges, not to motions that raise

collateral issues such as the effectiveness of trial counsel.' " (quoting *United States v. Mayo*, 14 F.3d 128, 132 (2d Cir.1994))).

 When timely asserted, the assessment undertaken by a district court when considering a pre-direct appeal collateral attack is similar to the task before the Court of Appeals when an appellant presents an ineffectiveness claim on direct appeal. Both circumstances require a balancing of the interests of justice, efficiency, and finality. When the question is before the appellate court, three options are available: "[the appellate court] may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before [the appellate court]." *United States v. Morris*, 350 F.3d 32, 39 (2d Cir.2003) (citing *United States v. Leone*, 215 F.3d 253, 256 (2d Cir.2000)).

 The first and second procedural avenues—remanding the case while staying a pending appeal or permitting a collateral attack on the underlying conviction once all arguments on direct appeal have been exhausted—provide for fact-finding in the district court. While "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance," *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), the Court of Appeals has "from time to time ... remanded in the course of a direct appeal for the district court to resolve an ineffectiveness claim in the first instance, permitting [the appellate court] to review that resolution as part of any subsequent appeal." *United States v. Doe*, 365 F.3d 150, 153 (2d Cir.2004). *See also Trevino v. Thaler*, ⸺ U.S. ⸺, 133 S.Ct. 1911, 1921, 185

L.Ed.2d 1044 (2013) (noting that "practical considerations, such as the need for a new lawyer, the need to expand the trial court record, and the need for sufficient time to develop the claim, argue strongly for initial consideration of [a] claim [of ineffective assistance] during collateral, rather than on direct, review").

■■ The third option—deciding a claim of ineffective assistance on a direct appeal—is generally least desirable because evidence not in the trial record is often necessary to ascertain the bases for a trial attorney's tactics. This is particularly so because, in the wake of *Massaro v. United States,* 538 U.S. at 504–06, 123 S.Ct. 1690, an ineffective assistance of counsel claim is not waived by a defendant's failure to raise the issue on direct appeal. There is little reason to require a defendant to hastily develop an ineffective assistance claim on direct appeal.

Here, where DiMattina had retained new counsel for his appeal and was primed to use the same evidence asserted on his Rule 33 motion for his section 2255 motion, the Court of Appeals selected an expedited course of action, staying the appeal while remanding the case for consideration of a section 2255 motion. This has permitted consideration of two issues that might—if this court ruled in Defendant's favor on the section 2255 motion—have obviated the need for a direct appeal and limited the possibility of an unwarranted long incarceration of Defendant while an appeal was pending.

DiMattina's failure to achieve collateral relief notwithstanding, his efforts, *see* Part IV, *infra,* underscore an array of complications that should be examined whenever considering ordering a decision on a section 2255 motion before resolution of the direct appeal. Some of these issues were recognized by the Court of Appeals two years ago in *United States v. Vilar,* 645 F.3d 543 (2d Cir.2011). In rejecting an appellant's request to stay his criminal appeal pending pursuit of a section 2255 motion, it observed that:

Absent a showing that the habeas application is much more promising [than a direct appeal], judicial economy would seem to favor pursuing the direct appeal first. Direct appeals are generally less time consuming and expensive than habeas application because they involved a fixed record and simpler procedures and standards of review. Moreover, successful habeas applications often result in new trials, while successful direct appeals often do not. And unsuccessful habeas applications often lead to appeals to the circuit court, necessitating another round of briefing....

While ... consolidation [of a direct appeal and appeal from a denial of a habeas application] would reduce the number of appellate adjudications, few if any judicial resources would be conserved. The consolidated appeals would entail different standards, different records, and separate analyses. And simultaneous adjudication of interrelated issues using different standards and different records would increase the complexity of the consolidated appeal. Thus, there is little reason to believe that a consolidated appeal would save significant time or energy compared to two separate appeals.

*Id.* at 548.

Aside from matters of judicial economy, fairness to the defendant must be taken into account. A multitude of difficult strategic choices will confront the moving section 2255 party when litigating a collateral attack prior to a decision on a direct appeal, not the least of which is the Antiterrorism and Effective Death Penalty Act's (AEDPA) limitation on successive collateral attacks. *Cf.* 28 U.S.C. § 2255(h) ("A

second or successive motion must be certified ... by a panel of the appropriate court of appeals to contain ... newly discovered evidence ... or ... a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court."). This stringent limitation on a collateral attack enhances a movant's burden to pursue every claim that might demonstrate a conviction was achieved "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Requiring pre-direct appeal filing of a section 2255 motion may lead to defendants pursuing collateral claims prematurely in an effort to avoid time-consuming litigation over the availability of successive section 2255 motions. In the instant case, the district court gave DiMattina a full airing of all his possible collateral claims.

A separate complication is arises from evidentiary pressures placed on a defendant in presenting evidence on a pre-direct appeal section 2255 motion. On a collateral ineffective assistance of counsel claim, the moving party may be aided if he or she takes the stand and offers testimony aimed at discrediting trial counsel's testimony on effective assistance. In the present case, the viability of DiMattina's claim that trial counsel failed to pursue an available alibi defense necessarily rests on what the client knew, when he acquired the knowledge, and whether and when it was communicated to trial counsel. Yet, where a direct appeal is pending, the decision by someone like DiMattina to testify at the collateral hearing carries substantial risks. Cross-examination by the government in the section 2255 motion proceeding might have had a potentially dispositive effect on the success of a parallel direct appeal on issues unrelated to whether counsel was effective.

If a section 2255 motion is denied but reversal is granted on direct appeal, a defendant's testimony at a section 2255 hearing may provide avenues of attack on credibility or contentions of the defendant at the new trial. A strong incentive may exist for a defendant to reject the opportunity to testify at the section 2255 hearing. *Cf.* John H. Mansfield & Margaret A. Berger et al., Evidence: Cases and Materials 1385 (9th ed. 1997) ("It would, of course, be improper for the prosecutor to call the accused to the stand and thereby force him to invoke the privilege in the presence of the jury."). But, forces favoring testifying at a hearing on a collateral attack may be strong enough to effectively deny the right against self-incrimination. Since a section 2255 motion may be deemed theoretically civil in nature, the failure of a defendant to testify may permit an adverse inference in a parallel civil case (as exists in the present litigation) or on the section 2255 motion, a matter which need not now be explored. *Cf. LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997) (Fifth Amendment permits adverse inference against party to civil action even if government is a party to that action) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)); *Orena v. United States,* 956 F.Supp. 1071, 1093 (E.D.N.Y.1997) (noting, but not deciding, issue of Fifth Amendment application to proceedings triggered by a motion pursuant to section 2255); Rules Governing § 2255, Rule 1, Advisory Committee Notes (1976 Adoption) ("[T]he fact that Congress has characterized the motion as a further step in the criminal proceedings does *not* mean that proceedings upon such a motion are of necessity governed by the legal principles which are applicable at a criminal trial regarding such matters as counsel, presence, confrontation, self-incrimination, and burden of proof." (emphasis in original)).

No adverse inference is drawn from DiMattina's failure to testify at his section

2255 evidentiary hearing. And, DiMattina cannot claim that the procedure used here effectively limited his power to prove his contentions. It was he who suggested that the appellate court direct a pre-appeal section 2255 motion be heard. *See* Order, *United States v. DiMattina*, No. 12–1361 (2d Cir. Jan. 15, 2013), Dkt. Entry No. 32.

Pressures from an early section 2255 hearing may also affect the bar and its ethical obligations. There is a high probability that, at a hearing on a collateral ineffective assistance claim, a defendant's trial counsel will be forced to reveal otherwise privileged communications. Such communications may affect a direct appeal or retrial. Trial lawyers have ethical obligations both to the court and to their clients. They must vigorously defend and advocate on behalf of their client; they must also not "assist or participate in the presentation of perjured testimony." *People v. DePallo*, 96 N.Y.2d 437, 441, 729 N.Y.S.2d 649, 754 N.E.2d 751 (2001).

Finally, the government may be handicapped. Its efforts at a hearing on a claim of ineffective assistance of counsel will be aimed at demonstrating the effectiveness of a defendant's trial counsel. At the same time, the government cannot give too much credence to strategy and legal arguments pursued by trial counsel lest it be seen as validating a defendant's argument on direct appeal.

## IV. Asserted Grounds for Relief

### A. Ineffective Assistance of Counsel

#### 1. Law

The Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *See Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. This test applies to a claim of ineffective assistance of counsel at any stage of the litigation. *See Hill v. Lockhart*, 474 U.S. 52, 57, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir.2001).

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes*, 337 F.3d 253, 260 (2d Cir.2003) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052) (footnote omitted; brackets in original). Ineffective assistance may be

demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski,* 321 F.3d 110, 112 (2d Cir.2003).

 Reasonable strategic choices by counsel after an appropriate investigation of the facts and law are "virtually unchallengeable"; those "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052.

The Court of Appeals for the Second Circuit has at least implied that each of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel after operating under trial-stress requiring brisk decisions. *See Eze,* 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

## 2. Application of Law to Facts Pertaining to Ineffective Assistance of Counsel

Defendant claims that his conviction was obtained as a result of trial counsel's ineffectiveness. He contends that his trial attorneys—principally, Meringolo and Geduldig—failed to investigate and present an alibi defense at trial. Relevant to such a contention is the reasonableness of any decision that was made not to pursue an alibi defense. DiMattina's overall innocence or guilt only tangentially relates to this inquiry. *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052.

Prior to trial, Bowers had apparently not pinpointed the date and time on which the gun extortion occurred. This presented the kind of problem common both to the defense and the government at many trials: will the witness testify consistently with his prior statements and bolster the government's case?; or will he contradict himself and bolster the defense? Solving this "problem" is basic in our adversarial system's quest to gain "truth" by screening facts through pleadings, discovery and evaluation of evidence before a petit jury.

Meringolo and Geduldig both testified at the habeas hearing. Notwithstanding DiMattina's failure to testify and contest his trial attorneys' testimony, the court independently assessed their veracity and credited their testimony. The two trial defense attorneys credibly testified that DiMattina never mentioned to either of them the possibility of an alibi defense or gave them any reason to believe that one existed. *See* Ineffective Assistance Hr'g Tr. 57 (Meringolo); 74–75 (Geduldig). Their testimony is contradicted only by the affidavit DiMattina submitted in support of his Rule 33 motion and incorporated by reference into his section 2255 motion. DiMattina declares in that affidavit that "[p]rior to trial I informed my then-attorney that I could not be at the place where Mr. Bower's [sic] said I was when he said I threatened him.... I asked my attorney *many* times for the specific date when I was accused of extorting Mr. Bowers." DiMattina Rule 33 Aff. ¶ 20 (emphasis in original). As noted, *see* Part II.F, DiMattina's supplemental affidavit submitted in support of his section 2255 motion does not declare that he ever communicated to his trial attorneys that he had a possible alibi. *See* DiMattina section 2255 Aff. ¶ 4.

 DiMattina has chosen not to testify in his own defense. That is his constitutional right. Yet, he cannot use that right

as shield to protect him from potential criminal liability while concomitantly wielding his affidavits as a sword to cast doubt on testimony found credible by the court as fact-finder. Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight. *See A.B. Leach & Co. v. Peirson,* 275 U.S. 120, 128, 48 S.Ct. 57, 72 L.Ed. 194 (1927) (Holmes, J.) ("A man cannot make evidence for himself by writing a letter containing the statements he wishes to prove."). They are insufficient to alter the court's conclusion that his trial attorneys, Meringolo and Geduldig, credibly testified that they did not ignore their client's wishes to pursue an alibi defense. *Cf. Thai v. United States,* No. 99–CV–7514, 2007 WL 13416, at *6 (E.D.N.Y. June 2, 2007) ("[D]efendant's assertion that his counsel refused to permit him to testify, if unsubstantiated and based upon self-serving testimony, may be defeated by the submission of a detailed affidavit from trial counsel credibly describing the circumstances concerning appellant's failure to testify." (internal citations omitted)). Nor did Schoenbach, the attorney retained after the conviction who helped DiMattina develop his alibi defense, provide evidence to buttress any claim that DiMattina expressly communicated the possibility of an alibi defense to his trial attorneys. No testimony was offered by Schoenbach that DiMattina ever complained to him that his trial attorneys ignored a potential alibi defense. *See* Ineffective Assistance Hr'g Tr. 103.

■ Any reasonable strategic decision by trial counsel not to call unknown alibi witnesses—even assuming DiMattina had, in fact, made trial counsel aware of their possible existence—is not grounds for collateral relief. *See, e.g., United States v. Best,* 219 F.3d 192, 201 (2d Cir.2000) ("counsel's decision as to 'whether to call

specific witnesses—*even ones that might offer exculpatory evidence*—is ordinarily not viewed as a lapse in professional representation' " (quoting *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.1997) (emphasis added))); *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (citation and internal quotation marks omitted)). It is reasonable to infer that experienced trial counsel chose to allocate resources to pursue more promising defenses rather than one with a low probability of success. *See, e.g., Weeks v. Senkowski,* 275 F.Supp.2d 331, 341 (E.D.N.Y.2003) (refusal to call possible alibi witnesses was sound strategic decision). Launching an unsuccessful alibi defense might well have had the unintended consequence of reinforcing the credibility of the government's chief witness. *Cf. Henry v. Poole,* 409 F.3d 48, 65 (2d Cir.2005) ("[I]t is generally acknowledged that an attempt to create a false alibi constitutes evidence of the defendant's consciousness of guilt." (internal citation and quotation marks omitted)).

Trial counsel's strategy to destroy the credibility of Bowers, and thus obtain an acquittal on all counts, was justified. It was obvious that a dispute between DiMattina and Bowers arose in the aftermath of DiMattina's sale of Ariana's in Staten Island to Bowers. The commercial agreements centered on far more than a bid on a school lunch program, and it was reasonable to argue that Bowers's complaint of extortion was an attempt to sabotage DiMattina commercially. *Cf. Lynn v. Bliden,* 443 F.3d 238, 247 (2d Cir.2006) ("As a general rule, a habeas petitioner will be able to demonstrate that a trial counsel's decisions were objectively unreasonable only if there [was] no ... tactical justifica-

tion for the course taken." (citation and quotation marks omitted; brackets in original)). That DiMattina's current counsel may have uncovered evidence that indicates his criminal trial might have been better conducted does not, by itself, meet the threshold required to invalidate a conviction based on ineffective assistance of counsel. *See United States v. Katz,* 425 F.2d 928, 931 (2d Cir.1970) (Friendly, J.) ("Although some of the other particulars advanced by new counsel indicate that the case could have been better tried, these are a long way from the showing required to invalidate a conviction because of lack of effective assistance of counsel." (internal citation omitted)).

■ Even assuming DiMattina could establish that the decision not to investigate or present an alibi defense was unconstitutional, he would still be unable to show that he was prejudiced by this decision. A constitutional violation will only lie when there is a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The alibi evidence, primarily presented in the form of affidavits from DiMattina's friends, customers, employees, and business associates, is suspect. *Cf. United States v. Donald,* 669 F.Supp.2d 336, 339 (W.D.N.Y.2009) (finding that an affiant's fraternal relationship to the defendant supported giving his hearsay allegations about a government witness "little weight"); *United States v. Schlesinger,* 438 F.Supp.2d 76, 103 (E.D.N.Y.2006) ("[T]he formality of a court, the presence of the litigants, and the gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private and attempting to appease the losing side's advocate. Some witnesses fall prey to influences—perhaps the persuasive

influence of a skilled advocate asking leading questions, perhaps the less wholesome influence of the defendant's friends." (internal citations and quotation marks omitted)). The testimony of many of his alibi affiants—"discovered" approximately a month after trial after prodding from his new counsel—is bolstered largely by business records created by DiMattina's employees or DiMattina himself.

Supplemental live testimony elicited from five of the affiants through direct and cross-examination at the section 2255 hearing does nothing to alter the conclusion that the "newly discovered" alibi evidence would not have led to DiMattina's acquittal. The testimony of Habeeb, Honadel, and Wall—all of whom hosted parties at Ariana's in Staten Island and claimed not to have seen DiMattina there on the date in question—establishes only that three individuals who spent very little time in the parking lot next to Ariana's on June 26, 2010 did not see DiMattina in those areas. Actual Innocence Hr'g Tr. 72–73 (Habeeb: "Q: You don't know what happened outside while you were inside? A: No, I don't."); 81 (Wall: "Q: Could you tell us anything that went on in the parking lot while you were inside at the party? A: No."); 86 (Honadel: "Q: During the party, did you have any reason to go in the parking lot? A: No."). Such evidence is entitled to little weight in assessing whether DiMattina's purported alibi defense would have altered the outcome of his criminal case.

No significance can be found in Frigione's and Gorgoglione's testimony offered to establish that DiMattina was in New Jersey and not in Staten Island on the day in question. Frigiano, the maître d' at DiMattina's catering hall in New Jersey, could not establish that DiMattina was exclusively in New Jersey throughout the day. Frigiano only claimed to be able

to account for DiMattina's whereabouts after 10:00 a.m. or 11:00 a.m. on June 26, 2010. But even for that time period, there are gaps in time when Frigiano would not have seen DiMattina. *See id.* at 94–98. Gorgoglione's testimony is largely equivalent to that of Habeeb, Honadel, and Wall. The fact that he did not see DiMattina at Ariana's in Staten Island on a certain day at a certain time and in a certain place (the parking lot) does not establish that DiMattina was not there.

Bowers's phone records from the day of the extortion are also insufficient to establish prejudice. The geolocation data proves only that Bowers's phone was within 1.3 miles of Ariana's in Staten Island and only when calls were made or received on the phone. Bowers himself does not recall whether he had the phone on his person on the morning of June 26th. Actual Innocence Tr. 133. But, even if he was traveling with his phone close by, the data does not permit a strong enough inference to discredit the consistent testimony of Bowers, Chiarappo, and Father Reilly that the jury found credible. There remain substantial time lapses in the phone records on the morning of June 26th for which no geolocation data is available. And, even assuming—on top of the assumption that the phone was at all times on Bowers's person—that the cell phone towers that routed calls to and from Bowers's phone were functioning perfectly, the data does not prove that Bowers was so far away from Ariana's in Staten Island that he could not have been threatened there by DiMattina on June 26th. The jury's implied findings are not incompatible with Bowers's phone records.

It is of no significance that the records show that DiMattina may not have "called" Bowers prior to extorting him (as was suggested in the pre-trial FBI report). Bowers's trial testimony made no mention of DiMattina calling him prior to the incident. Bowers credibly testified at the section 2255 hearing that he does not recall whether he told an agent of the FBI that DiMattina "called" him the morning of June 26th. *See* Actual Innocence Hr'g Tr. 123–26, 128–29. The statement in the FBI report is not sufficiently reliable to cast doubt on Bowers's credibility. *See, e.g., United States v. Leonardi,* 623 F.2d 746, 757 (2d Cir.1980) ("[A] witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them."). The lack of an incoming call from DiMattina to Bowers on the phone records is not inconsistent with any testimony of Bowers—it does nothing to diminish Bowers's credibility or call into question the jury's verdict.

Typical of DiMattina's post-verdict strategy is his current counsel's analysis of a purported "mistake" Bowers made in identifying a weapon he was shown as the one used to extort him. *See* DiMattina Innocence Br. 6. At a gun lineup the day before trial, Bowers was shown four guns owned by DiMattina. Trial Tr. 57. At that time, he identified the gun used to threaten him as a "9–millimeter Smith and Wesson." *Id.* He testified at trial that an additional gun, a .32 automatic, was "too small" to be the weapon used by DiMattina. *Id.* at 114. Relying on evidence that the .32 automatic was the only one of DiMattina's four guns for which he had a license to carry it out of his home and that he only had a home resident permit for the 9–millimeter Smith and Wesson, DiMattina now contends that "the gun Bowers claimed to have seen"—i.e., the 9–millimeter Smith and Wesson—could not have been the one DiMattina carried on his person. *See* DiMattina Innocence Br. 6. But the fact that DiMattina had only a home permit for the identified gun does not prove that it was not carried out of his

home by the defendant on the day of the threatening incident.

The parsing of the trial record by Defendant's present counsel with the aid of tangentially related affidavits and phone records present a fine-grained nitpicking of how several items of evidence might have been discovered, analyzed and relied upon by trial counsel to attack the credibility of a government witness and to reduce the probative force of the government's case. Neither individually nor together do these items show lack of effective counsel or innocence. *See* Part IV, *infra*. They are mere jetsam and flotsam of a well-tried case where trial counsels' decisions can almost always be reevaluated in retrospect.

The jury's credibility determination on testimony offered by Bowers, Chiarappo and Father Reilly remains. It would not likely have been disturbed by any of the evidence presented in the section 2255 motion. There are substantial gaps in accounting for DiMattina's whereabouts on the day Bowers alleges he was extorted with a gun—for example, it is undisputed that DiMattina began his day in Staten Island, not far from the location where the jury found him to have extorted Bowers with a gun. *See* Ineffective Assistance Hr'g Tr. 123 ("Government: Can we also agree that those statements taken as a whole are not a minute-by-minute accounting for Mr. DiMattina's whereabouts on June 26, 2010? [Mr. Schoenbach]: I think that's a fair statement."); *id.* at 129 (Defendant's Counsel: "[The affidavits] don't overlap for the entire day, as I mentioned before, from dawn until dusk or later.").

■ It is not in the trial court's power to "second-guess trial counsel's defense strategy simply because the chosen strategy has failed." *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir.1987). There is no reasonable ground upon which

to conclude that DiMattina suggested to his trial attorneys a potential alibi defense or that, if asserted, it would have made a difference. Trial counsel cannot have been expected to present an alibi a defense when neither their client nor the evidence in the case provided a reason for them to assert one. Viewing the situation *ex ante*, as *Strickland* requires, the decision not to rely on an alibi defense was not unreasonable or constitutionally deficient. Perceptive Monday morning quarterbacking—although well-executed by DiMattina's current counsel—does not trump well-reasoned, on-the-scene decision-making.

## B. Actual Innocence

### 1. Law

Despite the fact that Defendant's conviction was not the product of constitutionally deficient procedure, *see* Part III.A., *supra*, inquiry is appropriate on whether collateral relief can be granted based on his independent claim of innocence. On this "actual innocence" claim, the relevant question is rooted in a need to determine when a claim of innocence rings sufficiently "true" so that an otherwise constitutionally-valid conviction cries out to be set aside.

Apparently no defendant has succeeded in overturning a conviction on such a precise ground—or at least no court has admitted it has done so. But, in view of the widespread availability of DNA, social science and other evidence convincingly demonstrating innocence, such a claim, when proved to a high degree of probability, will be recognized as required by substantive due process.

Two decades ago, in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court considered a collateral attack on a death sentence in which the petitioner argued he was innocent based on affidavits purportedly estab-

lishing innocence filed ten years after his conviction for murder. *Id.* at 396–97, 113 S.Ct. 853. It was argued by petitioner that his innocence would render his execution unconstitutional under the Eighth and Fourteenth Amendments. *Id.* The Court affirmed the lower court's denial of the writ, citing with approval Justice Holmes's observation that " 'what we deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.' " *Id.* at 400, 113 S.Ct. 853 (quoting *Moore v. Dempsey*, 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (Holmes, J.)).

But the opinion of the Court went on to "assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no ... avenue open to process such a claim." *Id.* at 417, 113 S.Ct. 853. *See also id.* at 419, 113 S.Ct. 853 (O'Connor, J., concurring) ("I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution."); *id.* at 429, 113 S.Ct. 853 (White, J., concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case."); *id.* at 430, 113 S.Ct. 853 (Blackmun, J., dissenting) ("[T]he Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence."). While noting that the "threshold showing for such an assumed right would necessarily be extraordinarily high," the majority denied habeas relief because "the showing made ... falls far short of any such threshold." *Id.* at 417, 113 S.Ct. 853. *Cf. Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (habeas court may review an independent constitutional claim that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt); *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of "Shuffling Sam" on direct review from conviction in Louisville's police court where there was no evidence that defendant violated city ordinance).

More than a decade after *Herrera*, in *House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), the Supreme Court considered a habeas challenge to a state capital conviction which asserted innocence both as a "gateway" to reaching constitutional claims forfeited under state law and as a substantive basis for habeas relief. As to the gateway claim, the Court reaffirmed its earlier holding in *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), that "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *House*, 547 U.S. at 536–37, 126 S.Ct. 2064 (quoting *Schlup*, 513 U.S. at 327, 115 S.Ct. 851). While emphasizing that the *Schlup* standard "permits review only in the extraordinary case," *id.* at 538, 126 S.Ct. 2064 (internal quotation marks omitted), the Court cautioned that it "does not require absolute certainty about the petitioner's guilt or innocence." *Id.*

On the freestanding actual innocence claim, as it did in *Herrera*, the Court in *House* "decline[d] to resolve the issue" of whether such a claim is cognizable, finding only that, "whatever burden a hypothetical freestanding innocence claim would re-

quire, this petitioner has not satisfied it." *Id.* at 555, 126 S.Ct. 2064. Despite its reluctance to recognize innocence as a ground for habeas relief, the Court nonetheless hinted that a successful innocence claim would, "at the least ... require[ ] more convincing proof of innocence than" what is required on a gateway claim. *Id.* at 555, 126 S.Ct. 2064.

Whether a freestanding claim of innocence may be adjudicated, either in capital or noncapital cases, remains "an open question." *See Dist. Attorney's Office v. Osborne,* 557 U.S. 52, 71, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009) (Roberts, C.J.) (assuming, without deciding, that a freestanding innocence claim exists in a non-capital case); *McQuiggin v. Perkins,* —— U.S. ——, 133 S.Ct. 1924, 1931, 185 L.Ed.2d 1019 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." (citing *Herrera,* 506 U.S. at 404–05, 113 S.Ct. 853)). *Cf. In re Davis,* 557 U.S. 952, 130 S.Ct. 1, 174 L.Ed.2d 614 (2009) (remanding an "original" habeas petition to district court for factfinding on freestanding innocence claim).

Unlike some other Courts of Appeals, the Court of Appeals for the Second Circuit has apparently not ruled on whether a claim of actual innocence is cognizable. *Compare Friedman v. Rehal,* 618 F.3d 142, 159 (2d Cir.2010) (citing *Dist. Attorney's Office,* 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009), and noting that whether an actual innocence claim is cognizable is an open question), *with In re Swearingen,* 556 F.3d 344, 348 (5th Cir. 2009) ("The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review."); *Fielder v. Varner,* 379 F.3d 113, 122 (3d Cir.2004) ("It has long been recognized that '[c]laims of actual innocence based on newly discov-

ered evidence' are never grounds for 'federal habeas relief absent an independent violation.'" (citing and quoting *Herrera,* 506 U.S. at 400, 113 S.Ct. 853)); *Johnson v. Bett,* 349 F.3d 1030, 1038 (7th Cir.2003) (claims based on newly discovered evidence "must relate to a constitutional violation independent of any claim of innocence"); *Burton v. Dormire,* 295 F.3d 839, 848 (8th Cir.2002) ("[W]e have squarely rejected the notion that a prisoner may receive a writ simply because he claims he is innocent."); *Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997), *cert. denied,* 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998) (noting that a majority of the Justices in *Herrera* would have supported a free-standing innocence claim and assessing whether petitioner could succeed on such a claim). *Cf. Young v. Conway,* 715 F.3d 79, 80 (2d Cir.2013) (Parker, J., concurring in denial of rehearing en banc) ("At one end of the spectrum, there are respected jurists who believe that habeas is essentially an artifact that should be limited almost to the point of nonexistence *and might not even be available in cases of actual innocence.* There are others, such as I, who believe habeas review is an essential component of federalism; that it is not discretionary; and that it is in fact required of us by the Constitution and by the oath we take to defend it." (internal citation omitted; emphasis added)).

Nor have lower federal courts in the Eastern District of New York reached a consensus on the issue. *Compare Chin v. United States,* No. 08–CV–1755 (FB), 2009 WL 3380725, at *4–7 (E.D.N.Y. Oct. 19, 2009) (assuming existence of freestanding innocence claim), *with Cole v. Walsh,* No. 05–CV–736 (SLT), 2009 WL 3124771 (E.D.N.Y. Sept. 29, 2009) ("[T]his Court assumes that a freestanding actual innocence claim does not constitute a cognizable ground for habeas relief."); *Weeks,* 275 F.Supp.2d at 337 ("A showing of actual

innocence serves merely as a gateway to the airing of petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim.").

While refusing to accept the justiciability of a freestanding claim of actual innocence, the Court of Appeals for the Second Circuit has come close. It permitted habeas relief upon a finding that, without the prosecution's knowledge, critical trial testimony was perjured. *See Ortega v. Duncan*, 333 F.3d 102 (2d Cir.2003). This position is much more favorable to a defendant's collateral attack than the classic view that the government must somehow have known, or should have known, of the deceptive testimony. *See, e.g., Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'") (quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935)); *Smith v. Gibson*, 197 F.3d 454, 460 (10th Cir.1999) (holding that "petitioner had to establish that the prosecutor *knowingly* presented false testimony"); *Reddick v. Haws*, 120 F.3d 714, 718 (7th Cir.1997) ("[T]his circuit demands proof that the prosecution made knowing use of perjured testimony."); *Jacobs v. Singletary*, 952 F.2d 1282, 1287 n. 3 (11th Cir. 1992) ("[O]nly knowing use of perjured testimony constitutes a due process violation."); *Smith v. Black*, 904 F.2d 950 (5th Cir.1990) ("The Fifth Circuit has long abided by the standard requiring that for use of perjured testimony to constitute constitutional error, the prosecution must have knowingly used the testimony to obtain a conviction." (citing cases)), *vacated in part on other grounds*, 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992); *United States v. Jones*, 614 F.2d 80, 82 (5th Cir.1980) ("[F]or perjury by a witness to constitute grounds for relief appellant would have to show that the Government knowingly used the perjured testimony.").

In *Ortega*, the petitioner was convicted of murder in a state court based, in large part, on the testimony of a purported eyewitness to the crime. *See Ortega*, 333 F.3d at 103–04. Seven years after his conviction, petitioner's counsel was informed by the district attorney's office that the eyewitness had falsely testified in a separate murder trial in which he served as the government's chief eyewitness. *Id.* at 105. The eyewitness subsequently recanted the testimony he provided at Ortega's criminal trial, first in an affidavit and then at evidentiary post-conviction hearings held in state and federal court. *Id.* 105–06. Conceding that "a showing of perjury at trial does not *in itself* establish a violation of due process warranting habeas relief," *id.* at 108 (emphasis added), the Court of Appeals held that false testimony presented without the government's knowledge may nonetheless support an independent violation of due process " 'if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.' " *Id.* (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991) (bracketed material in original)).

Although *Ortega* doctrinally rests on a violation of due process, its analysis seems forced. It was explicitly acknowledged by the Court of the Appeals that the case was "treat[ed] ... as one in which there was no prosecutorial *knowledge* of the perjury." *Id.* at 108 n. 3 (emphasis added). There was no indication that the prosecutor had tainted the trial by withholding any information or any basis for believing that the jury's credibility determination of witnesses was infected by a constitutional violation. The constitutional "error" of perjured testimony was only discovered

after a verdict had been rendered. What must be acknowledged is that subsequent discovery of perjured testimony had the effect of negating critically important evidence of culpability—it indicated that the defendant was probably innocent. *Id.* at 109 ("We are ... left with the firm belief that but for Garner's trial testimony, it is unlikely that the jury would have convicted Ortega."). A more forthright analysis might have admitted that habeas relief was granted in *Ortega* based on freestanding innocence demonstrated after the trial.

The unwillingness of courts to explicitly acknowledge freestanding claims of actual innocence does not mean that such claims are never accepted. Findings of actual innocence when linked to an independent constitutional violation can lead to the same relief that would be achieved in a freestanding innocence claim. *See, e.g., Rivas v. Fischer,* 687 F.3d 514, 553 (2d Cir.2012) (finding "credible and compelling claim of actual innocence" to excuse one-year limitations period in AEDPA and "urg[ing] the District Court to take whatever steps needed, in the exercise of its discretion, to facilitate a full, fair, and speedy adjudication of the merits of his petition"); *Lopez v. Miller,* 915 F.Supp.2d 373, 431–35 (E.D.N.Y.2013) (granting unconditional release from custody for habeas petitioner found to have met *Schlup* actual innocence standard and to have received ineffective assistance of counsel).

■ The existence of a "gateway" to the merits founded on innocence underscores a prisoner's "powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated." *Kuhlmann v. Wilson,* 477 U.S. 436, 452, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). That is why factual innocence is the touchstone in deciding whether a petitioner's otherwise-defaulted claim of constitutional error should be heard. *See McQuiggin,* 133 S.Ct. at 1928 ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House,* or, as in this case, expiration of the statute of limitations."). *See also* 28 U.S.C. § 2244(b)(2)(B)(i) (possible "factual predicate" for claim presented in a second or successive petition must "not have been discover[able] previously through the exercise of due diligence" and "be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense"); 28 U.S.C. § 2255(h)(1) ("A second or successive motion must be certified ... by a panel of the appropriate court of appeals to contain ... newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense."). *Cf. Harris v. Reed,* 489 U.S. 255, 271, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (Rehnquist, C.J., concurring) (explaining that there must be "a kind of 'safety valve' for the 'extraordinary case' where a substantial claim of factual innocence is precluded by an inability to show cause" for procedural default).

As one court has observed, "a defendant with a strong case of innocence will always find a 'constitutional violation' that he can attach to his innocence claim, allowing him to challenge his conviction." *In re Davis,* No. 409–CVC–130, 2010 WL 3385081, at *43 n. 36 (S.D.Ga. Aug. 24, 2010), *appeal dismissed & request for cert. of app. denied sub nom. Davis v. Terry,* 625 F.3d 716 (11th Cir.2010), *cert. denied sub nom. Davis v. Humphrey,* —— U.S. ——, 131 S.Ct. 1787, 179 L.Ed.2d 654 (2011). *See also United States v. Tod,* 264 U.S. 131,

133, 44 S.Ct. 260, 68 L.Ed. 590 (1924) ("The denial of a fair hearing is not established by proving merely that the decision was wrong.... The error ... may, of course, be so flagrant as to convince a court that the hearing had was not a fair one."); *Davis*, 2010 WL 3385081, at *43 n. 36 ("As a practical matter, by forcing mistakenly convicted individuals to tether those claims to constitutional mistake, the system suffers twice—once for its mistake and again for the 'error' that was manufactured to allow the claim of innocence to be heard."); Brandon L. Garrett, *Judging Innocence*, 108 Colum. L.Rev. 55, 109–13 (2008) (discussing how claims brought pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in several cases have effectively been used to assert innocence). *Cf.* William J. Stuntz, *The Uneasy Relationship Between Criminal Procedure and Criminal Justice*, 107 Yale L.J. 1, 61–62 (1997) ("[A]s the Supreme Court and lower appellate courts have developed standards of review for different kinds of constitutional claims, the courts consistently have adopted more favorable standards of review for non guilt-related claims than for those claims most likely to be tied to guilt and innocence.").

Candor would authorize federal courts to issue collateral relief setting aside a judgment of conviction based on innocence. The implications of a direct acknowledgement of court-fashioned circumventions for the lack of a freestanding innocence claim would be substantial: it would permit federal courts, in effect, to expand the writ of habeas corpus under the All Writs Act and Constitution, independently of AEDPA, based on innocence. *Cf. Boumediene*, 553 U.S. at 785, 128 S.Ct. 2229 ("Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant. This is so ... even where the prisoner is detained after a criminal trial conducted in full accordance with the protections of the Bill of Rights." (internal citation omitted)). The due process rights protected under sections 2254 and 2255, the All Writs Act and the Constitution would apply to both state and federal convictions. A limited freestanding innocence substantive right based upon developing technology and reliable social science would then be available.

The rising tide supporting recognition of an avenue for habeas relief based on actual innocence is sound. Developments in science and our better understanding of topics such as false confessions and false identifications militate in favor of adjudicating freestanding claims of innocence. *See, e.g., J.D.B. v. N. Carolina*, ⸺ U.S. ⸺, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011) (observing that "the pressure of custodial interrogation is so immense that it can induce a frighteningly high percentage of people to confess to crimes they never committed" (internal quotation marks and citation omitted)); *Perry v. New Hampshire*, ⸺ U.S. ⸺, 132 S.Ct. 716, 737–39, 181 L.Ed.2d 694 (2012) (Sotomayor, J., dissenting) ("Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by postevent information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy; and that suggestiveness can stem from sources beyond police-orchestrated procedures." (internal citations omitted)); *Young v. Conway*, 698 F.3d 69, 78–85 (2d Cir.2012) (drawing on social science literature to affirm grant of habeas relief for conviction obtained through unreliable eyewitness identification), *reh'g en banc denied*, 715 F.3d 79 (2d Cir.2013); *Harris v. Thompson*, 698 F.3d 609, 631–32 (7th Cir. 2012) (jury "had reasons to question" relia-

bility of videotaped confession "in line with leading research on false confessions"); *State v. Henderson*, 208 N.J. 208, 231, 27 A.3d 872 (2011) (acknowledging that " '[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country' " (quoting *State v. Delgado*, 188 N.J. 48, 60–61 & n. 6, 902 A.2d 888 (2006))); Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L.Rev. 1051, 1060 (2010) ("Over the past two decades, scholars, social scientists, and writers have identified at least 250 cases in which they determined that people likely falsely confessed to crimes. New cases are regularly identified."). The advent of DNA testing—to consider just one technological example—may provide definitive knowledge on whether an individual, imprisoned after a lawful trial, is actually innocent and should be released. *See e.g.*, Barry Scheck, *Professional and Conviction Integrity Programs: Why We Need Them, Why They Will Work, and Models for Creating Them*, 31 Cardozo L.Rev. 2215, 2251 (2010) ("There seems little doubt that if the appropriate case gets there, the Supreme Court will confirm that proof of actual innocence does state a constitutional claim."). Given this powerful trend, this court assumes that a freestanding innocence claim is cognizable.

Finding that a freestanding innocence claim is a basis for setting aside a conviction requires answering the question of what quantum of proof of innocence is needed to prevail on such a claim. The Court in *Herrera* found that "the threshold showing" for a freestanding claim of innocence "would necessarily be *extraordinarily high*." *Herrera*, 506 U.S. at 417, 113 S.Ct. 853 (emphasis added). It noted in *House* that "at the least ... *Herrera* requires more convincing proof of innocence than" the *Schlup* standard which requires a showing that it is "more likely than not [that] any reasonable juror would have

reasonable doubt." *House*, 547 U.S. at 538, 554–55, 126 S.Ct. 2064. At the appellate level, only the Court of Appeals for the Ninth Circuit has articulated a standard for determining whether a petition merits relief based solely upon innocence, holding that the petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *See Carriger*, 132 F.3d at 476. At a minimum, as *House* suggests, a party asserting a freestanding innocence claim has the burden of meeting the *Schlup* standard that it is "more likely than not [that] any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 554–55, 126 S.Ct. 2064.

It is likely that the burden will ultimately be set higher than the *Schlup* standard and may resemble the "shock the conscience" threshold sometimes used to assess substantive due process claims. *Cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Strict compliance at trial with constitutional procedural requirements cannot be the only measure for freeing a clearly innocent person from prison. Basic American notions of substantive due process cannot tolerate such an injustice.

Submitting those who can prove their innocence through highly reliable evidence to continued criminal punishment following an otherwise constitutional trial is "brutal and ... offensive to human dignity." *Chavez v. Martinez*, 538 U.S. 760, 774, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (quoting *Rochin*, 342 U.S. at 172, 72 S.Ct. 205). What once might have been viewed as regrettable, but acceptable, error in our criminal justice system cannot be countenanced in an age where DNA testing, reliable social science research, and other forms of decisive proof are available.

While admittedly nebulous, a "shocks the conscience" standard may provide the easiest bridge to correcting the injustice of punishing the innocent. *Cf. Herrera*, 506 U.S. at 430, 113 S.Ct. 853 (Blackmun, J., dissenting) ("Nothing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent." (internal citations omitted)). While not statistically and probability based, a "shocks the conscience" standard is one that courts already apply when reviewing due process challenges to executive conduct, inquiring whether an action taken by a member of the executive engaged in behavior irredeemably offensive to the contemporary conscience. *See, e.g., Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[F]or a half century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.").

That there would be close and difficult cases, particularly as this new basis for a collateral attack is developing, cannot be gainsaid. But, as the struggle over criminal procedures and substance in recent years has demonstrated, providing for the fair and effective justice envisioned by the Constitution is not easy.

█ The writ of habeas corpus directs the executive to bring the body of a person in custody before a judge or court. It "is the remedy which the law gives for the enforcement of the civil right of personal liberty." *Ex parte Tom Tong*, 108 U.S. 556, 559, 2 S.Ct. 871, 27 L.Ed. 826 (1883). Having been entrusted with the power to rein in arbitrary executive detainment of prisoners, the judiciary must be authorized to issue a writ of habeas corpus where the executive, or an official acting at the behest of the executive, detains an innocent person in prison. *Cf. Hamdi v. Rumsfeld*,

542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion) ("[U]nless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions."). It is beyond cavil that such conduct by the executive would shock the conscience of any contemporary culture.

### 2. Application of Law to Facts Pertaining to Actual Innocence

█ If the jury system as constitutionally required is to be given its due, DiMattina's conviction cannot be disregarded on the record amassed on this section 2255 motion. As demonstrated in Parts II.F and IV.A.2, *supra*, there is inadequate proof supporting a claim of innocence. "Newly discovered" affidavits and phone records offering what is claimed to be a conflicting narrative to the one presented by Bowers at trial do not sufficiently support a finding that the consistent testimony of Bowers, Chiarappo, and Father Reilly should be disregarded and that DiMattina is actually innocent. Weak circumstantial evidence of the nature now presented will not suffice to demonstrate constitutional harm warranting section 2255 relief on the basis of actual innocence.

The evidence presented by DiMattina in his section 2255 motion does not demonstrate that any of the government's witnesses, including Bowers, committed perjury when they testified against him. Unlike the key witness in *Ortega*, Bowers has not recanted his testimony in this or any other criminal case. To the contrary, Bowers's testimony was firmly corroborated at trial by the testimony of Chiar-

appo and Father Reilly, *see* Trial Tr. 117, 207–08, and 230, and to some extent by subsequently produced phone records, *see* Parts II.F and IV.A.2, *supra*.

This is not a case indicating constitutional or jurisdictional defect in the trial. Collateral relief is not warranted.

### V. Certificate of Appealability

A certificate of appealability pursuant to 28 U.S.C. § 2253(c)(I)(B) and Rule II of the Rules Governing § 2255 Proceedings is denied. DiMattina's claims on this motion raise no substantial constitutional violation.

### VI. Conclusion

The section 2255 motion is denied. No costs or disbursements are awarded.

SO ORDERED.